Steven C. Dawson, Bar No. 006674
Anita Rosenthal, Bar No. 006199
Sander R. Dawson, Bar No. 032243
DAWSON & ROSENTHAL, P.C.
25 Schnebly Hill Road
Sedona, Arizona 86336-4233
Telephone: (928) 282-3111
Facsimile: (928) 282-3126
dandr@dawsonandrosenthal.com

Scott E. Davis, Bar No. 016160
SCOTT E. DAVIS, P.C.
8360 E. Raintree Drive, #140
Scottsdale, Arizona 85260
Telephone: (602) 482-4300
Facsimile: (602) 569-9720
email: davis@scottdavispc.com

Scott M. Harris, Bar No. 011524
SCOTT M. HARRIS, P.C.
8360 E. Raintree Drive, Suite 140
Scottsdale, Arizona 85260
Telephone: (602) 252-7400
Facsimile: (602) 795-5610
email: harris@smharrislaw.com

*Attorneys for Plaintiff Mark Biliack*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| MARK BILIACK, M.D., and individual,<br><br>Plaintiff,<br>vs.<br><br>THE PAUL REVERE LIFE INSURANCE COMPANY, a Massachusetts Corporation; UNUM GROUP, a Delaware Corporation; AUSTIN JEROME PHILBIN, M.D., an individual; SUZANNE BENSON, M.D., an individual,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND JURY REQUEST** |

Plaintiff Mark Biliack (hereinafter "Dr. Biliack" or "Plaintiff"), through undersigned counsel, hereby files his Complaint and alleges as follows:

## I. PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Dr. Mark Biliack is a resident of Arizona residing in Cave Creek, Arizona within the District of Arizona.

2. Defendant Unum Group ("Unum") is a general business corporation organized under the laws of Delaware. Its headquarters, main administrative office and home office, principal place of business, and the primary location for its corporate books and records, are all at 1 Fountain Square, Chattanooga, Tennessee. Unum Group also has corporate offices at 2211 Congress Street, Portland, Maine, 1 Mercantile Street, Worcester, Massachusetts, and 1200 Colonial Life Blvd., Columbia, South Carolina. Unum Group is licensed to do business in Arizona and is doing business within the District of Arizona. Unum Group acts as an insurance holding company under the insurance holding company acts of the various states, including Arizona, and under the holding company statutes is the ultimate controlling person of The Paul Revere Life Insurance Company ("Paul Revere"). Prior to changing its name to Unum Group in 2007, Unum Group was known as UnumProvident Corporation. Before June 30, 1999 and its merger with Unum Life Insurance Company, the entity that is now known as Unum Group, and which became UnumProvident Corporation, was known as Provident Companies, Inc. In 1997, Provident Companies, Inc. acquired Paul Revere.

3. Unum Group's insurance company subsidiaries sell a variety of insurance products, such as disability insurance, long-term care insurance, life insurance, employer and employee paid group benefits and related services. Although insurance policies are issued by Unum Group's insurance company subsidiaries, these subsidiaries have no employees. Employees of Unum Group provide services to Unum Group's subsidiaries, including Paul Revere, pursuant to a General Services Agreement. In that regard, Unum

Group's production activities consist of services provided by its employees to its insuring subsidiaries relating to facilities management, provision of legal services, internal audit, cash management, financial management, actuarial services, product pricing, corporate relations, marketing and product support, sales management, product design, underwriting, systems management and claims management. The majority of Unum Group's production activities occur in Tennessee, Massachusetts, Maine and South Carolina.

4. Defendant The Paul Revere Life Insurance Company is a corporation organized and existing under the laws of Massachusetts. Paul Revere no longer has any employees and no longer actively markets insurance policies under its own name. Individual own occupation disability insurance policies once issued by Paul Revere, such as that issued to Plaintiff in this matter, are part of what Unum Group has designated as the “closed block.” While incorporated in Massachusetts, Paul Revere’s home office is now 2211 Congress Street, Portland, Maine, the same address as one of the corporate offices of Unum Group. With respect to administering policies previously issued by Paul Revere and claims for benefits made on such policies, the majority of the above-mentioned production activities occur in Worcester, Massachusetts; Chattanooga, Tennessee; Portland, Maine; and Columbia, South Carolina.

5. Pursuant to its agreement(s) with The Paul Revere Life Insurance Company and its other insuring subsidiaries, Unum Group is engaged in the business of insurance, performing such activities as the design, marketing, sale, underwriting, daily policy administration, and administration of claims arising under policies issued by Paul Revere and others. Defendant Unum Group has represented to third parties that it is the administrator for claims arising under policies issued by Paul Revere and other insurers, some of which are, like Paul Revere, subsidiary entities and some of which are outside of its holding company structure. Regarding claims it administers for either its subsidiary insurers or non-subsidiary insurers, defendant Unum Group uses the same claim handling practices and manages claims on an enterprise level.

6. As insurers and entities engaged in the business of insurance, licensed to do business within Arizona, Defendant Unum Group, and Paul Revere (referred to jointly as "Defendants") and their officers, directors, employees and agents are charged with knowledge of the laws of Arizona, more particularly those laws pertaining to the business of insurance including statutory, regulatory and common law obligations.

7. The relationship between Paul Revere and Unum Group is such as to make them joint venturers, a single enterprise, and/or alter egos of one another regarding the administration of claims for which Paul Revere is nominally responsible. The insurance claim of plaintiff Biliack, made on policies issued by Paul Revere, was actually administered by employees and/or agents of defendant Unum Group or its predecessor entities.

8. Defendant, Austin Jerome Philbin, ("Philbin" or "Defendant Philbin") is a medical doctor employed by Unum as an on-site physician ("OSP"), and works and resides in Massachusetts.

9. Defendant, Suzanne Benson, ("Benson" or "Defendant Benson") is a medical doctor employed by Unum and has the title of Designated Medical Officer ("DMO"), and works and resides in Tennessee.

10. All Defendants have caused acts to occur in the State of Arizona which have given rise to Plaintiff's claims herein.

11. There is complete diversity between the parties and, as alleged below, the amount in controversy exceeds $75,000.00. This court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a)(1).

## II. UNDERLYING FACTS

12. At all times relevant hereto, Plaintiff Mark Biliack's occupation was that of an anesthesiologist.

13. On December 21, 1992, Dr. Biliack applied for a Paul Revere Preferred

Professional Disability Policy. This policy was intended to replace a disability income policy Dr. Biliack had previously obtained from Provident Life and Accident Insurance Company.

14. On January 1, 1993, Paul Revere issued Policy 0102596054 to Dr. Biliack. [**Exhibit 1**]. As issued, Dr. Biliack's policy was non-cancellable and guaranteed continuable to age 65. Dr. Biliack has been continuously insured under this Paul Revere policy since it was issued and has paid all premiums due and owed.

15. Policy 0102596054 provides Total Disability Benefits beginning the 91st day from the date the insured is unable to perform the important duties of his or her occupation and is receiving Physician's Care. This policy was issued with a Lifetime Benefit Rider which provides monthly disability benefits to a disabled insured for as long as he or she lives.

16. As initially issued, Policy 0102596054 provided a Maximum Monthly Benefit Amount of $2,500.00. A Policy Change Rider was issued effective July 1, 1993, which increased the Maximum Monthly Amount to $4,500.00. This Policy also provided for Automatic Increases in the Monthly Benefit Amount, which raised the monthly benefit amount by the time of Dr. Biliack's disability to $5,150.00.

17. Policy 0102596054 also provides an Additional Monthly Indemnity Benefit, which is an additional $1,000.00 per month for a maximum of 365 days. This policy also contains a Supplemental Social Insurance Rider which after a 365 day Elimination Period provides $1,000.00 per month until age 65.

18. Policy 0102596054 provides a Cost of Living Adjusted Benefit Rider, which increases the maximum monthly benefit after each 12 month period of disability while disability continues until age 65.

19. On April 20, 1994, Paul Revere issued a second Preferred Professional Disability Income Policy to Dr. Biliack, Policy 0102666601. **[Exhibit 2].** As issued, Dr. Biliack's second policy was non-cancellable and guaranteed continuable to age 65. Dr.

Biliack has been continuously insured under this Paul Revere policy since it was issued and has paid all premiums due and owed.

20. Policy 0102666601 provides Total Disability Benefits if the insured is unable to perform the important duties of his or her occupation and is receiving Physician's Care. Initially issued, Policy 0102666601 provided a Maximum Monthly Benefit Amount of $3,000.00. This Policy also provides for five Automatic Increases in the Maximum Monthly Amount, which raised the monthly benefit amount by the time of Dr. Biliack's disability to $3,750.00.

21. Policy 0102666601 provides Total Disability Benefits beginning the 91st day from the date the insured is unable to perform the important duties of his or her occupation and is receiving Physician's Care. This policy was issued with a Lifetime Benefit Rider which provides monthly disability benefits to a disabled insured for as long as he or she lives.

22. Policy 0102666601 provides a Cost of Living Adjusted Benefit Rider, which increases the maximum monthly benefit after each 12 month period of disability while disability continues until age 65.

23. For approximately 20 years Dr. Biliack would periodically experience back and leg pain. There were a number of times when this pain was successfully treated with epidural steroid injections and therapy. Prior to becoming totally disabled from his occupation in 2015, Dr. Biliack had last undergone epidural injections in 2012. After the 2012 episode of back and leg pain, and subsequent to receiving epidural injections, Dr. Biliack was fully functioning in his occupation, living an active life, and regularly engaging in exercise and other physical activity.

24. Sometime in the first quarter of 2015 Dr. Biliack again began experiencing back and leg pain. This time the pain was of greater severity than he had previously experienced and he was also now experiencing severe pain in his hips, knees, and ankles.

25. Imaging studies in April 2015 revealed abnormalities in Dr. Biliack's spine,

including degenerative disc disease, spinal stenosis and a disc protrusion at L4-5. An EMG performed in May of 2015 demonstrated left greater than right lumbar radiculopathy.

26. Dr. Biliack's medical conditions cause him to experience severe pain and fatigue, significantly limit his mobility and prevent him from prolonged standing. Dr. Biliack is limited in his ability to carry, to lift, and to engage in bending or twisting. The pain also compromises Dr. Biliack's ability to concentrate and focus.

27. Dr. Biliack's occupation of anesthesiology is highly demanding and requires him to frequently move and position patients, providing patients with physical support. These activities require strength and the need to often bend and twist. Dr. Biliack's occupation also demands that he be capable of sustained concentration when administering and monitoring patients under anesthesia. The ability to perform all of these duties on a consistent basis is important to Dr. Biliack's occupation and is vital to the safety of his patients.

28. On or about May 5, 2015, Plaintiff became unable to work in his occupation as an Anesthesiologist as the result of the significant restrictions and limitations caused by his medical conditions. Since that time Plaintiff has been unable to perform the important duties of his occupation and his been under regular physician care.

29. On or about May 29, 2015, Plaintiff notified Defendants of his intent to file claims under his policies and requested all applicable claim forms.

30. By submission of July 8, 2015, Plaintiff was provided with claim forms. Dr. Biliack completed and returned the claim forms to Defendants.

31. Through Plaintiff's responses, the claim forms described the names of his medical conditions and symptoms; his pre-disability activities and those activities he was able to engage in since the onset of his disability; the names and contact information for his treating doctors; a list of his medications; a detailed description of his occupational duties, including the physical requirements; and a description of how his medical conditions have impacted his ability to perform his occupational duties.

32. Later in July, 2015, Dr. Biliack provided Defendants with an Attending Physician's Statement signed by his internist, Dr. Larry Gassner, M.D.

33. By letter of July 29, 2015, Defendants acknowledged receipt of Plaintiff's claim. Defendants' explained that using a disability date of May 5, 2015, Plaintiff's Elimination Period would be satisfied on August 3, 2015. Provided Plaintiff met the definition of total disability under his policies, his initial monthly disability benefit would be due as of September 4, 2015.

34. In August, 2015, Dr. Biliack provided Defendants with a second Attending Physician's Statement signed by his pain management doctor, Dr. Steven Fanto, M.D.; a signed authorization to collect and disclose information; numerous medical records from various health care providers for Plaintiff, including imaging studies; and employer contact information so that Defendants could directly request an Occupation Description and a summary of all applicable CPT codes for the preceding year.

35. On or about August 31, 2015, Defendants erroneously tried to characterize Plaintiff's disability policy number 0102596054 as being governed by ERISA.

36. Defendants have had a history and practice of attempting to classify the claims of its insureds as being governed by ERISA. This has been done for the purpose of seeking to limit Defendants' potential liability for bad faith conduct.

37. In early September, 2015, Defendants requested additional time to make a decision on Plaintiff's claims for disability benefits, stating that as of that time Defendants decision would be adverse to Dr. Biliack and that Defendants would not even consider paying benefits pursuant to a reservation of its rights.

38. By letter of September 16, 2015, Defendants represented that they were reviewing Plaintiff's medical records and hoped to have a better understanding of how Dr. Biliack's reported restrictions and limitations impact his ability to perform the material and substantial duties of his occupation as an Anesthesiologist.

39. Immediately thereafter Defendants decided they needed to conduct a

personal visit with Plaintiff "to further discuss [his] claim." Within days of this announced decision Defendants reiterated that they had not made a decision on Dr. Biliack's claim and stated that they would be issuing payment to Plaintiff under reservation of rights, including reserving "the right to seek return of any benefit."

40. By letter of December 18, 2015, Defendants informed Plaintiff that disability benefits were not approved beyond December 3, 2015. Defendants' letter stated that there was no support for Plaintiff's claimed restrictions and limitations (R&L's) beginning May 5, 2015, or thereafter, that Plaintiff's claim was closed effective December 3, 2015, and that Plaintiff did not qualify for the Waiver of Premium of benefit – meaning Plaintiff would be responsible for continuing to pay premiums to keep his disability coverage in force.

41. Prior to its December 18, 2015 denial of disability benefits, Defendants vocational review and field visit informed Defendants that Plaintiff had been working full time performing the occupation of anesthesiology, and that this required frequent standing; occasional sitting, walking, bending, and reaching; along with strength demands in the light range. Defendants learned that Plaintiff's occupation also included responsibility for moving, lifting, and positioning patients; that he was required to stoop, bend, and sometimes to even crawl, when administering anesthesia; that Plaintiff worked under emergency conditions and was required to pay particular attention to detail.

42. Prior to its December 18, 2015 denial of disability benefits Defendants had received a medical record from Dr. A. Gianni Vishteh, from an April 29, 2015, neurosurgery consultation. Dr. Vishteh's record informed Defendants that Plaintiff presented for a consultation about a flare-up of lower back pain, which recent epidural blocks had only helped a little; that Plaintiff has degenerative disc disease of the lumbar spine at L5-S1 with discogenic degeneration, and moderate foraminal stenosis bilaterally at L5-S1 and L4-5; MRI dated April 16, 2015 of the left hip as read by Raymond Murray, M.D., revealed severe left hip osteoarthritis with lateral acetabular rim hypertrophy, severe

superior labral degeneration, and a dominant intraosseous pseudocyst measure of 17 x 18 mm, as well as moderate right hip osteoarthritis; that Plaintiff was advised to continue conservative management of his pain with potential transforaminal blocks and not lifting or moving his patients.

43. Prior to its December 18, 2015 denial of disability Defendants had received medical records from Dr. Jerome Grove, a pain management physician who performs interventional procedures. Dr. Grove's records informed Defendants that Plaintiff was experiencing a high level of pain, as well as anxiety and depression; that Plaintiff had undergone two epidural steroid injections (ESI) in March, 2015 with another provider which only provided minimal relief; that Dr. Grove performed a lumbar ESI at L5-S1 on July 31, 2015 that provided only transient relief; that Dr. Grove performed another lumbar ESI on October 22, 2015, this time at L2-L3 and L3-L4, as well as a radio frequency ablation (RFA) of the dorsal root ganglion at L2 and L3.

44. Prior to its December 18, 2015 denial of disability Defendants had received medical records from Dr. Susan Sorosky, Board Certified in Physical Medicine and Rehabilitation and Pain Medicine of June 26, 2015. Dr. Sorosky's records informed Defendants that Plaintiff presented with severe pain in his left hip, extending into his thigh and knee and that this was likely due to Plaintiff's severe osteoarthritis; that an MRI of Plaintiff's hips showed severe left hip osteoarthritis and moderate right hip osteoarthritis; that an MRI of the lumbar spine showed degenerative disc changes at L4-5, L5-S1; that she strongly recommended orthopedic follow up and possible total hip replacement given the severity of Plaintiff's osteoarthritis and pain.

45. Prior to its December 18, 2015 denial of disability Defendants had received medical records from Dr. David Camarata, an orthopedic surgeon of June 2, 2015. Dr. Camarata's records informed Defendants that Plaintiff had significantly decreased range of motion of his left hip; that he had a positive Trendelenburg sign, meaning Plaintiff exhibited problems with the abductor muscles in his left hip, which causes pain and leads

to instability; and that Dr. Camarata discussed with Plaintiff the possibility of total hip replacement in the future.

46. Prior to its December 18, 2015 denial of disability Defendants had received medical records from Dr. Joy Schechtman, F.A.C.R. (Fellow of the American Academy of Rheumatology), from office visits of May 14 and June 24, 2015. Dr. Schechtman's records informed Defendants that she too had reviewed Plaintiff's MRI studies of his lumbar spine and hips; that left hip range of motion testing resulted in reproducible pain; that examination caused popping in Plaintiff's left hip; that she found Plaintiff to have severe osteoarthritis of his left hip and labral degeneration (the ring of cartilage that follows the outside rim of the socket of the hip joint); that an EMG/NCS (nerve conduction study) of May 29, 2015 was abnormal and showed Plaintiff had chronic lumbar radiculopathy.

47. Prior to its December 18, 2015 denial of disability Defendants had received medical records from Dr. Larry Gassner, Plaintiff's primary care physician, for a follow up of July 16, 2015. Dr. Gassner's record informed Defendants that Plaintiff had severe left degeneration of his lumbar disc with myelopathy (neurologic deficit), thus lumbar radiculopathy; weakness along the nerve path from the L4-5 distribution on the left; and left severe degenerative arthritis of his hip.

48. Prior to its December 18, 2015 denial of disability Defendants had received records from Dr. Steven Fanto, specialist in pain management medicine, for an office visit of July 14, 2015, and completed attending physician statements of August 8, 2015, October 25, 2015, and December 19, 2015. These records informed Defendants that due to his pain, Plaintiff was taking hydrocodone medication prescribed by his primary care physician; that Dr. Fanto recommended repeat interventional pain procedures, including a repeat ESI; that due to Plaintiff's severe pain from his lumbar radiculopathy and left hip osteoarthritis, he is totally disabled and unable to work in any capacity, including being unable to perform the duties of his profession of anesthesiology, as Plaintiff's pain prevents any prolonged sitting, standing, bending, and impairs his ability to concentrate.

49. Prior to its December 18, 2015 denial of disability Defendants had received the report of its field visit of October 12, 2015. Defendants' representative reported that Plaintiff was forthright; that he displayed evidence of pain; that prior to January 2015 Plaintiff's pain was at a level that he was able to work, but that he now was experiencing an increase of pain that compromised his ability to focus and concentrate; that as a result of the severity of the pain, Plaintiff was unable to sleep, and he was very often fatigued; that Plaintiff was suffering from increasing weakness and instability, primarily in his left leg; that he cannot sit or stand for long; and that he was having increasing difficulty safely assisting his patients.

50. In November, 2015 Defendants had learned that another disability insurance company had determined Plaintiff was disabled and approved his claim for disability benefits in September, 2015.

51. From September to December, 2015, Defendant, Dr. Philbin, reviewed Plaintiff's medical records, the field visit report, and surveillance. Dr. Philbin's reports to the Unum file handlers regarding Plaintiff consistently minimized the severity of Plaintiff's medical conditions, the severity of his pain, and the findings of Plaintiff's imaging studies, as well as focused on findings that ostensibly supported a denial of Plaintiff's claim for disability benefits while ignoring findings that supported Plaintiff's claim. Dr. Philbin also misrepresented Plaintiff's medical records and Plaintiff's statements.

52. Dr. Philbin initiated communication with two of Plaintiff's treating physicians. During these communications Dr. Philbin would express skepticism about the seriousness of Plaintiff's medical conditions, would act condescendingly to Plaintiff's doctors, and would attempt to lead them into conclusions and/or statements designed to build a case for the denial of Plaintiff's claim for disability benefits. Dr. Philbin also misrepresented his conversations with the treating doctors in a way that supported Defendants' focus on denying Plaintiff's claim.

53. Without having conducted his own examination of Plaintiff, without

Defendants having obtained an independent medical examination of Plaintiff, and by focusing only on information that might minimize Plaintiff's medical problems, Dr. Philbin rejected the opinions of Plaintiff's treating doctors regarding the seriousness of Plaintiff's medical conditions and the ways in which Plaintiff's medical conditions restricted and limited Plaintiff's ability to practice his occupation of anesthesiology.

54. Defendants know that in the event there is a legitimate dispute between its OSP and an insured's treating doctor, good faith claim handling standards require, and Defendants have previously agreed to abide by, arranging for the insured to undergo an independent medical examination.

55. Defendants did not have Plaintiff examined by an independent physician. Defendants chose to have another of its employees, Defendant, Dr. Suzuanne Benson, perform a comparison of the medical records and opinions of Plaintiff's treating doctors with the reports and opinions of her colleague, Dr. Philbin, and for Dr. Benson then to decide "with whom [she] agree[s] regarding R&L's, OSP or AP."

56. Defendants have intentionally created a conflict of interest between its employees with responsibility for adjudicating claims and the insureds who have submitted these claims. Defendants have created this conflict through financial incentives offered to its employees, consistent exposure to the financial results of the company, and the criteria Defendants use, and intentionally do not use, to evaluate the employees' performance.

57. The conflict of interest alleged in the prior paragraph includes Defendants employed doctors. Defendants Philbin and Benson are eligible to receive up to 20% of their base earnings in an annual bonus, depending upon the financial success of the company.

58. Defendant Benson states in her reports that her review complies with the fair claims handling standard, and the standard Defendants have previously agreed to abide by, that significant weight will be afforded to a treating doctor's (AP's) opinion unless "the AP's opinion is not well supported by medically acceptable clinical or laboratory

diagnostic techniques and is not consistent with other substantial evidence in the claim file."

59. This representation by Defendant Benson was false, as her review did not give significant weight to the opinions of Plaintiff's treating doctors. Instead, Defendant Benson reviewed the records in a slanted fashion to support her predetermined outcome that "the OSP opinion [is] better supported than the AP opinions."

60. Defendant Benson's review intentionally minimized the severity of Plaintiff's medical conditions, the severity of his pain, and the findings of Plaintiff's imaging studies, as well as focused on findings that ostensibly supported a denial of Plaintiff's claim for disability benefits while ignoring findings that supported Plaintiff's claim.

61. By letter of December 18, 2015, Defendants denied Plaintiff's claim for disability benefits. Defendants' letter misrepresented Plaintiff's medical records; misrepresented statements made by Plaintiff's treating doctors, and ignored information that supported Plaintiff's claim. Defendants letter also imposed a requirement that Plaintiff have objective evidence to support his complaints of pain even though his polices contain no such standard and even though Defendants know there is no way to obtain objective evidence of pain. In addition, on information and belief, Defendants' letter misrepresented the results of its covert surveillance of Plaintiff.

## III. CAUSES OF ACTION

### A. Breach of Contract as to Paul Revere and Unum Group

62. Plaintiff incorporates by reference paragraphs 1 – 61 as though fully set forth herein.

63. Plaintiff had contracts for disability insurance with Defendant Paul Revere Life Insurance Company.

64. Plaintiff complied with each and every term of his contracts.

65. Without just cause or excuse, Defendants Paul Revere and Unum Group,

acting in concert, as a single enterprise, joint venture, or alter egos of one another ceased paying benefits to Plaintiff to which he is entitled under the terms of his contracts.

66. As a consequence of Defendants' Paul Revere and Unum Group's breach of contract, Plaintiff suffered damages, to wit:

a. Loss of monthly indemnity for each month that he has been disabled from May 5, 2015 to the start of trial in an amount to be determined by proof at trial;

b. Loss of funds and the use of funds used to pay premiums to keep his policies in force during a period of disability after Defendants denied payments, cancelled is waiver of premium benefit and required premium payments beginning in May 205 through the start of trial in an amount to be determined by proof at trial.

**B. Breach of the Obligation of Good Faith and Fair Dealing – Paul Revere and Unum Group**

67. Plaintiff incorporates paragraphs 1 – 66 as though fully set forth herein.

68. Defendants acting in concert, as a single enterprise, joint venture, or alter egos of one another, had no reasonable basis to delay and deny the payment of benefits under Plaintiff's insurance policies.

69. In delaying and denying benefits to Plaintiff under his disability policies, Defendants knew that they were acting without a reasonable basis in their investigation and evaluation of the claims presented.

70. Defendants failed to conduct a reasonable investigation of Plaintiff's claim, and instead conducted an investigation that was outcome-focused on finding a plausible basis to deny Plaintiff's claim.

71. Defendants failed to objectively evaluate facts, including ignoring facts that supported Plaintiff's claim for disability benefits.

72. Defendants misrepresented facts that supported Plaintiff's claim.

73. Defendants failed to give appropriate weight to the opinions of Plaintiff's treating doctors.

74. In all aspects of investigating or evaluating Plaintiff's claim for benefits under his policies of disability insurance, Defendants failed to give Plaintiff's interests at least as much consideration as their own and instead elevated their interests above that of Dr. Biliack.

75. Defendants failed to reasonably or fairly investigate Plaintiff's claim, failed to take reasonable measures to ensure the ongoing payment of Plaintiff's claim, and deliberately conducted a biased investigation for the wrongful and purposeful intent to avoid paying Plaintiff's monthly total disability benefits owed.

76. Defendants have intentionally created and fostered the existence of a conflict of interest between its employees who handle and process disability insurance claims and its insureds who submit such claims, thereby encouraging and promoting an environment within its claims operation where Defendants' claims staff acts in an adversarial manner to the interests of Defendants' insureds, including Defendants' in-house doctor employees who are willing to engage in the creation of biased medical opinions.

77. Defendants have acted, and continue to act unreasonably, in relying on non-treating and non-examining personnel who do not qualify to render medical opinions regarding Plaintiff, and have acted and continue to act unreasonably by denying Plaintiff's claim without a medical foundation to do so.

78. Defendants purposefully ignored information by Plaintiff's qualified treating physicians, and instead placed their own interests ahead of Plaintiff's in order to deny Plaintiff's claim.

79. Defendants have intentionally and purposely implemented a system whereby its employees are not informed of court decisions that have criticized past behavior or practices engaged in by the employee, for the purpose of not discouraging such employees from continuing to act in a way that favors the interest of Defendants over the interests of

the insureds.

80. Defendants have designed a scheme whereby it rejects the well-founded opinions of its insureds' treating doctors by avoiding the use of outside independent medical evaluations, and utilizing in-house doctors who can be predicted to provide opinions that will give support to claim decisions that are adverse to the interests of insureds.

81. Defendants have intentionally engaged in insult and personal abuse of Plaintiff by accusing him of exaggerating and overstating his physical symptoms and complaints of pain, and suggesting that Plaintiff has falsely claimed that his medical conditions have disabled him from his occupation.

82. Defendants' engaged in these improper acts specifically knowing that Plaintiff was financially and emotionally vulnerable, and consciously disregarding a substantial risk of significant harm to Plaintiff.

83. Defendants denied Plaintiff's benefits knowing that Plaintiff's claim was valid and payable.

### C. Aiding and Abetting the Tort of Insurance Bad Faith – Drs. Philbin and Benson

84. Plaintiff incorporates paragraphs 1 – 83 as if fully set forth herein.

85. Defendants Paul Revere and Unum committed the tort of bad faith and thereby caused Plaintiff injury.

86. Defendants Philbin and Benson knew that Paul Revere and Unum's conduct was a breach of those Defendants' duty of good faith and fair dealing owed to Plaintiff.

87. Defendants Philbin and Benson took separate action in concert with Defendants Paul Revere and Unum and substantially assisted and encouraged Defendants Paul Revere and Unum in the achievement of the breach of the duty of good faith and fair dealing.

88. Defendants Philbin and Benson aided and abetted the tort of bad faith by

providing biased and unsubstantiated medical opinions.

89. Defendants Philbin and Benson aided and abetted the tort of bad faith by misrepresenting Plaintiff's medical records.

90. Defendant Philbin aided and abetted the tort of bad faith by his attempts to improperly influence Plaintiff's treating doctors and by misconstruing and misrepresenting the statements made by Plaintiff's treating doctors.

91. Defendant Benson aided and abetted the tort of bad faith by falsely claiming that she had applied the fair claim handling standard of providing significant weight to the opinions of Plaintiff's treating doctors.

92. On information and belief, Defendants Philbin and Benson further aided and abetted the tort of bad faith by misrepresenting the covert surveillance video taken of Plaintiff.

93. At all relevant times herein, Defendants Philbin and Benson engaged in these improper acts specifically knowing that Plaintiff was financially and emotionally vulnerable, and consciously disregarding a substantial risk of significant harm to Plaintiff.

94. The improper acts of all Defendants have caused Plaintiff extreme mental, emotional, and physical suffering.

95. Defendants' letter denying his claim for disability benefits deprived Plaintiff with the ability to provide for his financial support and security, and did so by impugning Plaintiff's honesty and integrity.

96. Upon information and belief, Plaintiff suffered from stress induced gastritis caused by all of the Defendants' conduct as set out above. Following receipt of Defendants' December letter, and Defendants' letter denying his request that Defendants reconsider their adverse position, Plaintiff presented in the Emergency Room on Sunday, January 24, 2016, and was reported to be "under increased amount of stress over the last several weeks secondary to his disability again terminating." Plaintiff was experiencing uncontrolled gastrointestinal bleeding; he went into hypovolemic shock; was described as being

"critically ill," and was admitted into intensive care.

## IV. PRAYER FOR RELIEF

97. Wherefore, as against all Defendants, Plaintiff prays for relief as follows:

a. An award of all past due benefits and unwaived premium payments from December 3, 2015 through trial in an amount to be determined according to proof inclusive of interest thereon as provided by law and as adjusted for cost of living allowances as provided by contract;

b. An award of future damages based on the value of benefits that would be received throughout Plaintiff's life pursuant to contract as damages for Defendants' tortious breach of the obligation of good faith and fair dealing, and Defendants Philbin and Benson's aiding and abetting the tort of insurance bad faith, all as previously set forth herein;

c. An award of past, present, and future damages for physical suffering, emotional distress, humiliation, inconvenience and anxiety as a result of Defendants' tortious breach of the obligation of good faith and fair dealing, and Defendants Philbin and Benson's aiding and abetting the tort of insurance bad faith, as previously set forth herein;

d. An award of punitive damages sufficient to punish each of the defendants and to deter them and similarly situated defendants from engaging in similar conduct in the future, commensurate with the reprehensibility of defendants conduct as provided by law; and

e. Such other relief as may be provided by law.

/ / /

## V. **TRIAL BY JURY**

98. Pursuant to Fed. R. Civ. P. 38(b) Plaintiff demands trial by jury.

DATED this 20th day of October, 2016.

DAWSON & ROSENTHAL, PC

*/s/ Steven C. Dawson*
Steven C. Dawson
Anita Rosenthal
Sander R. Dawson
25 Schnebly Hill Road
Sedona, Arizona 86336

SCOTT E. DAVIS, P.C.
Scott E. Davis
8360 E. Raintree Drive, #140
Scottsdale, AZ 85260

SCOTT M. HARRIS, P.C.
Scott M. Harris
8360 E. Raintree Drive, Suite 140
Scottsdale, AZ 85260

*Attorneys for Plaintiff*